UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                                    **Hon. Hugh B. Scott**

            v.

                                                    06CR210A

                                                    **Report**
                                                     **&**
DERRICK NAILOR,                                   **Recommendation**

                            Defendant.
_____

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C) (Docket No. 11). The instant matter before the Court is defendant's motion (Docket No. 12[1]) to suppress the seized handgun and his statements.

## BACKGROUND

Defendant was indicted on July 13, 2006, in a single count indictment for possession of a firearm by a convicted felon (Docket No. 7). The Indictment charges that defendant, convicted in Erie County Court in 2000 for a felony, was in possession of a Sig Sauer, Model P-220, .45

---

[1] In support of this motion, defendant submitted his attorney's affirmation, Docket No. 12. He attempted to file this motion previously, see Docket No. 10, but had ECF filing issues. As discussed in the text below, defendant eventually filed Proposed Findings of Fact and Conclusions of Law, Docket No. 24.
    In opposition, the Government submitted its initial Response to the motion, Docket No. 13, its Response to defendant's initial declination to filing post-hearing findings of fact, Docket No. 22, and its Response to Defendant's Proposed Findings of Fact and Conclusions of Law, Docket No. 26.

caliber semi-automatic pistol and seven rounds of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (id.).

In response to defendant's present motion, the Government contends that on April 4, 2006, at approximately 9:56 pm, defendant was a passenger in a vehicle stopped for a New York State Vehicle & Traffic Law infraction near 168 Jewett Avenue, Buffalo, New York (Docket No. 13, Gov't Initial Response at 2; Docket No. 1, Crim. Compl. ¶ 3). Upon exiting the vehicle, defendant allegedly fought with Buffalo Police officers Raymond Harrington and Pasqual Panaro and, during the struggle, defendant was found to be in possession of the firearm (Docket No. 13, Gov't Initial Response at 2; Docket No. 1, Crim. Compl. ¶ 3). The firearm was stolen from the home of another Buffalo Police officer (Docket No. 13, Gov't Initial Response at 2; Docket No. 1, Crim. Compl. ¶ 3).

Defendant moved to suppress the seized firearm (Docket No. 12, Def. Atty. Affirm. ¶¶ 12-16). Later, he argues that his subsequent statements also should be suppressed (see Docket No. 24, Def. Proposed Findings & Concls. at 4; see Docket No. 12, Def. Atty. Affirm. ¶ 17 (seeking further relief and additional motions)). The Government consented to an evidentiary hearing as to the stop and subsequent search of defendant (Docket No. 13, Gov't Initial Response at 1). Defendant also moves for various forms of discovery, namely a hearing under Federal Rules of Evidence 404(b) and 609, to divulge defendant's prior bad acts; disclosure of government informants; production of the Government agents' notes; disclosure of Brady material; and other relief (Docket No. 12, Def. Atty. Affirm. ¶¶ 4-11, 17), those portions of the motion were considered in a separate Order (Docket No. 25, Order of March 13, 2007).

*Suppression Hearing*

On October 11, 2006, a suppression hearing was held (see Docket No. 18, Tr.) and the Government produced two witnesses to testify; defendant declined to furnish proof. The first witness was Officer Harrington, the officer who first approached defendant. Harrington's partner, Panaro[2], was driving on April 4, 2006, and saw the Vehicle & Traffic Law infraction on the vehicle (the driver side mirror was broken) in which defendant was a passenger (id. at 8-9, 25). Panaro operated the patrol car's overhead light and pulled defendant's car over (id. at 23). Panaro approached the driver's side of the car while Harrington went to the passenger's side. Harrington noticed that there were five occupants in the car, including defendant in the front passenger seat (id. at 8, 10). As Panaro asked if the driver had a driver's license (id. at 9), Harrington asked defendant for his name and whether he had any identification (presumably including a driver's license) (id. at 10, 26, 40). Harrington initially asked this to determine if there was a licensed driver in the vehicle to avoid impounding it since he learned that the driver, later identified as Andre Hall, did not have a license (id. at 24, 26-27). Panaro removed Hall from the vehicle and was trying to place him in the patrol car (id. at 10) to verify on the patrol car's computer whether Hall had a license and run a routine warrant check on Hall (id. at 28). Harrington testified that typically someone would not be place under arrest and taken into custody for driving without a license (id.). If there was not a licensed driver, the vehicle would be impounded and all in the vehicle would be ordered out, but no one would have been arrested (id. at 28, 29).

---

[2]Or Penaro, as transcribed, see Docket No. 18, Tr.

Meanwhile, defendant was in the car and told Harrington his name, Derrick Nailor, and said that he did not have any identification (id. at 10). Harrington did not intend to arrest defendant for not having any identification (id. at 30-31). Defendant's name was familiar to Harrington because it was similar to a suspect in an attempted homicide, Dorian Nailor, that the Buffalo Police Department was also searching for (id. at 10-11). Harrington was not going to take defendant's word about his identity, hence Harrington repeatedly asked defendant for his name and date of birth to confirm his identity or determine if he was Dorian Nailor (id. at 11-12, 31-33), and eventually ordered defendant out of the vehicle (id. at 31). Harrington testified that he thought that defendant possibly was Dorian Nailor because he lacked identification (id. at 33) and had the same last name and first initial. Harrington was going to confirm who defendant was because a wanted felon (Dorian Nailor) was being sought (id. at 34-35). Harrington otherwise did not know Dorian Nailor, having learn of him through station house briefings weeks ago announcing the search for him (id. at 33-34). During Harrington's questioning, defendant kept looking out the front windshield and avoided eye contact with Harrington (id. at 12, 14). Harrington then ordered defendant to leave the car (id. at 36) for the officer's safety and to confirm defendant's identity (id. at 12-13, 36; Docket No. 24, Def. Proposed Findings & Concls. at 2).

After defendant left the car, Harrington began to pat him down, as a safety precaution (see Docket No. 18, Tr. at 15), before putting him in the patrol car (id. at 13, 37). Pursuant to Buffalo Police Department policy, see United States v. McCargo, 464 F.3d 192 (2d Cir. 2006) (upholding the department's "administrative" search policy), police officers automatically pat frisk a person before placing them into the patrol car (id. at 14). Harrington testified that he did not think

4

defendant was armed but the officer was taking precautions (id. at 13, 45).  On cross-examination, Harrington was asked why someone without identification was being placed in a patrol car, he answered that he "was investigating and confirming that [defendant] was who he said he was" (id. at 37), and that defendant was placed in the patrol car to confirm his identity (Docket No. 24, Def. Proposed Findings & Concls. at 2).  Given the officer's suspicion that defendant was in fact Dorian Nailor and having not yet confirmed defendant's identity, Harrington intended "to detain" defendant in the back of the patrol car and confirm his identity (Docket No. 18, Tr. at 14).

Harrington testified that "nobody gets in the back of a police car without being patted down for weapons" (Docket No. 24, Def. Proposed Findings & Concls. at 2, quoting Docket No. 18, Tr. at 13-14, 37, 53).  During this frisk, Harrington felt a bulge in the back of defendant's waistband that felt like a weapon (id. at 15-16).  At this point, defendant resisted and began fighting with Harrington.  The officer and defendant traded blows, wrestled, and defendant tried to flee.  (Id. at 16, 17).  In this melee, a gun fell out of the waistband and on to the ground (id. at 17).  Panaro came to assist Harrington, cuffing the defendant (id. at 18).  Panaro then searched and placed defendant in the patrol car (id.).  During this struggle, Harrington believed that the driver Hall and other passengers in the car scattered, and responding officers picked them up (id. at 19).

On cross-examination, Harrington was questioned about his decision to order defendant to leave the car and be placed in the police patrol car (id. at 36-40).  Harrington stated that he would not leave defendant in the vehicle, with three other unknown occupants, where defendant's name was very close to that of a wanted homicide suspect (id. at 45).  He later

5

testified that it was smarter to secure that scene by removing defendant for further questioning about his identity (id. at 52-53). Harrington repeated that his suspicions were aroused when defendant said his name, coupled with the ongoing search for an accused felon with the same last name (id.).

The second witness was Lieutenant John King, the patrol supervisor for Harrington's platoon. He heard Harrington and Panaro's call over the radio for assistance and reported to the scene (id. at 55, 60). After he arrived, Lt. King advised defendant of his Miranda rights (id. at 55). Lt. King also noted that the Buffalo Police Department was on the look out for homicide suspect Dorian Nailor and that Dorian Nailor was subsequently apprehended (id. at 58-59). Lt. King issued the Vehicle & Traffic Law summonses for the equipment problem (the broken mirror), and the driver not having a license (id. at 62-64).

The Government rested and defendant did not present any proof (id. at 64).

*Post-Hearing Submissions*

The Court ordered post-hearing briefing to be submitted by December 4, 2006, with responses by December 22, 2006 (Docket No. 16). After seeking additional time to respond (Docket No. 19, defense motion of Dec. 4, 2006), defendant's Court appointed counsel received a copy of the transcript on December 20, 2006 (see Docket No. 21, Def. Atty. Affirm. ¶ 3). On January 26, 2007, defense counsel filed an affirmation declining to file a post-hearing memorandum or proposed findings of fact and conclusions of law (id.; see also Docket No. 22, Gov't Response (indicating that, in light of this declination, the motion should be denied)). The Court sought additional briefing on the issue of the legality of requiring defendant be placed in a police patrol car while his identity was being confirmed (Docket No. 23). Defendant then

submitted his proposed findings of fact and conclusions of law (Docket No. 24). The Government was granted additional time to respond to these post-hearing submissions (text entry, Mar. 9, 2007) and filed its response (Docket No. 26). The Court then deemed the motion submitted as of March 19, 2007 (see text minute entry of Mar. 9, 2007).

## DISCUSSION

The issues here are (a) whether the initial stop of the vehicle defendant was riding in was justified and (b) whether the police officer was justified in attempting to place the defendant in the patrol car, which led to an administrative pat down search prior to being placed in the vehicle, see McCargo, supra, 464 F.3d 192, that revealed the firearm. But there is a preliminary, procedural issue of whether defendant has abandoned his motion due to defense counsel initially declining to file a post-hearing brief.

I.   Defendant's Initial Non-Response

The first issue is whether defendant has abandoned his motion to suppress given his counsel's initial declination to file a post-hearing memorandum and findings of fact. While summarizing in his affirmation the testimony from the hearing (Docket No. 21, Def. Atty. Affirm. ¶ 4), defense counsel stated that the cases he reviewed "does not permit good-faith, ethical, and professional advocacy of the suppression relief I have sought on behalf of my client," and he did not intend to file proposed findings of fact and conclusions of law (id. ¶ 5). Defense counsel, however, urged the Court to give defendant sufficient time to brief this issue pro se if the client disagrees with counsel's assessment (id. ¶ 6). Defense counsel (and defendant) did not formally withdraw the motion. The Government concludes from defense counsel's affirmation that the motion should be denied (Docket No. 22).

Defendant's motion was not deemed waived by defense counsel's response or lack of post-hearing submissions (Docket No. 23). While argument concerning the legality of the stop or removal of defendant from the vehicle may be precluded by existing case law (as discussed in some detail below), the Court disagreed with counsel's initial assessment that no argument can be made in good faith, ethically, or professionally (cf. Docket No. 21, Def. Atty. Affirm. ¶ 5) in support of defendant's motion. The Court also declined to accept the Government's invitation (Docket No. 22) to deny this motion on the grounds of purported abandonment and requested briefing on the legality of having defendant placed in the police patrol car while his identity was being confirmed (Docket No. 23). Defendant, in fact, later filed proposed findings of fact and conclusions of law (Docket No. 24). As will be discussed below, the issue of the propriety of placing (or intending to place) the defendant in the police vehicle once removed from the car provides arguable grounds for the defense motion to suppress.

II.     The Initial Stop

The Fourth Amendment protects persons against "unreasonable searches and seizures," U.S. Const. amend. IV. "Evidence seized pursuant to an unreasonable search or seizure or evidence that is the 'fruit' of an unreasonable search or seizure must be suppressed and cannot be used in the prosecution's case in chief," McCargo, supra, 464 F.3d at 196 (citing James v. Illinois, 493 U.S. 307, 312 (1990); Wong Sun v. United States, 371 U.S. 471, 484-86 (1963)). Terry v. Ohio, 392 U.S. 1 (1968), outlines the Fourth Amendment standard for the exception for allowing a warrantless stop and search of persons. Under Terry and its progeny, the police officer needs "reasonable suspicion," United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994), that "criminal activity may be afoot" to justify an investigatory stop, Terry, supra, 392 U.S. at 30;

McCargo, supra, 464 F.3d at 197. "The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further. If the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." Illinois v. Wardlow, 528 U.S. 119, 126 (2000). Here, there was reasonable suspicion to stop the vehicle defendant was riding in from the Vehicle & Traffic Law violation of the broken equipment, see United States v. Dhinsa, 171 F.3d 721 (2d Cir. 1999); Whren v. United States, 517 U.S. 806 (1996).

While it is clear that the driver is seized when his vehicle is stopped during a traffic stop, see Whren, supra, 517 U.S. at 809-10, the United States Supreme Court and the United States Court of Appeals for the Second Circuit have not held that a passenger is also seized during such a traffic stop, raising a standing question, see also Townes v. City of N.Y., No. 94 Civ. 2647, 1998 U.S. Dist. LEXIS 2739, at *9-10 (S.D.N.Y. Mar. 10, 1998) (for qualified immunity in civil rights case, noting that the Second Circuit has not yet held that passengers have standing to challenge traffic stops, while many other Circuits have) (see also Docket No. 26, Gov't Response at 4, contending that defendant as a passenger lacks standing to challenge the stop). Cf. People v. Brendlin, 45 Cal. Rptr. 3d 50 (2006) (holding that the defendant passenger did not show sufficient police restraint to have the traffic stop constitute a "seizure" of him). Courts in this Circuit have held that a passenger indeed has standing to challenge a stop, United States v. Arellano, No. 05CR655, 2006 U.S. Dist. LEXIS 19692, at *5 (E.D.N.Y. Mar. 20, 2006) (citing cases). If he was seized at that time, he then has standing to challenge the basis for the stop. There is a question whether defendant, as a mere passenger, constitutionally was seized when the officers stopped the car driven by Hall. Cf. Florida v. Bostick, 501 U.S. 429, 436 (1991) (holding that there was no seizure of passenger on bus when officers boarded and questioned

him).  While the traffic stop for a Vehicle and Traffic Law infraction may have probable cause to stop the driver, that infraction alone is <u>not</u> sufficient for probable cause to stop the <u>passenger</u>, <u>see</u> <u>Maryland v. Wilson</u>, 519 U.S. 408, 413-14 (1997).  As a practical matter, however, when the vehicle was stopped, all of its passengers and contents were also stopped, <u>see id.</u>  In <u>Wilson</u>, the Court held that there was probable cause to arrest defendant, in part from his apparent nervousness in front of the police and the crack cocaine that fell to the ground as he exited the vehicle, 519 U.S. at 415 n.3, 410-11.  But this arrest was based upon grounds separate from the basis for the initial stop of the vehicle.  Here, defendant is not challenging the basis for the stop so the question of his standing to so challenge is not presented.

The issue then becomes what prevented defendant from walking away from these officers once the vehicle was stopped for the equipment infraction, given the absence of probable cause to stop him.  Harrington testified that the driver and defendant did not have identification or a driver's licenses (Docket No. 18, Tr. at 9, 10, 26).  As Harrington conceded (<u>id.</u> at 30-31), this alone does not justify detaining the defendant as a passenger.  Courts, however, have recognized that the police may order a passenger out of a lawfully stopped vehicle without violating the passenger's Fourth Amendment rights, <u>id.</u>, 519 U.S. 408; <u>Mollica v. Volker</u>, 229 F.3d 366, 369 (2d Cir. 2000); <u>United States v. Green</u>, 381 F. Supp. 2d 125, 127 (W.D.N.Y. 2005) (Larimer, J.).  The traffic infraction of the broken side view mirror was sufficient cause for a lawful stop.  Defendant then lawfully could be asked to step out of this legally stopped vehicle for further inquiry within a <u>Terry</u> stop.  The next step is whether the officers could detain defendant once removed from the vehicle, <u>cf.</u> <u>Wilson</u>, <u>supra</u>, 519 U.S. at 413-14, when the stop moves closer to a seizure.  In particular, could the police place defendant in the patrol car while they conducted

further inquiry into his identification (leading to an administrative pat down search of him prior to entry into that vehicle)?

III.     Placement in Police Car and Administrative Search

Terry justifies a pat down frisk during a stop where an officer believes that a person is armed and dangerous, 392 U.S. at 27; see McCargo, supra, 464 F.3d at 200.  The Fourth Circuit held that a passenger may be patted down only if specific, articulable suspicion of danger could be cited, United States v. Sakyi, 160 F.3d 164, 170 (4th Cir. 1998), upholding the search there because that defendant possessed a device known to be used as drug paraphernalia provided suspicion to warrant the search.  Since the pat down search is more intrusive than a mere order out of the vehicle, the police needs a justification for the pat down search beyond that for the initial stop, id. at 169, and the removal order.  The stated justification here is the officer's desire to place defendant inside the police patrol car, which (under departmental policy) requires a pat down search before admission.

      A.     McCargo and Administrative Searches

The Second Circuit recently upheld the Buffalo Police Department's policy of requiring all persons to be pat down searched prior to being placed in a police vehicle, as an administrative search, McCargo, supra, 464 F.3d at 199-202.  In McCargo, the defendant was near the scene of a crime and was placed in the police vehicle to be taken to that crime scene for victim identification, id. at 195.  The Second Circuit held that transporting the defendant there was justified (to facilitate victim identification at the scene of the crime) and, given the administrative search required before placing anyone in a police patrol car, the administrative pat frisk of the defendant was constitutional, id. at 197-202.

11

Defendant here argues that the Government did not adduce proof of any policy by the Buffalo Police Department to require pat down frisks of all persons entering a patrol car to justify Officer Harrington's actions here. Instead, defendant contends that the Government relied only upon Officer Harrington's testimony which may have been his personal (rather than an official) practice. (Docket No. 24, Def. Proposed Findings & Concls. at 4.) He distinguishes this search from the administrative search upheld in McCargo because the Circuit Court there found that the existence of the policy requiring such a pat down search before entering the police vehicle, cf. McCargo, supra, 464 F.3d at 201 (id. at 3-4). Since the Government cannot reopen the hearing to present such evidence, defendant concludes that the handgun here was illegally seized and the handgun and defendant's statements thus must be suppressed (id. at 4). The Government responds that Officer Harrington was asked if a person placed in a patrol car automatically would be patted down and he answered that they would (Docket No. 26, Gov't Response at 7-8 (quoting Docket No. 18, Tr. at 14)).

The Second Circuit in McCargo recognized the existence of the Buffalo Police Department policy requiring a pat down search prior to entry into a patrol car, 464 F.3d at 201 (the "department-wide policy that requires the pat-down" found to be "universally applied to all who are transported"), from the testimony of one officer that it was departmental policy to conduct such a pat down search, id. at 196. Thus, the Government need not establish proof of this policy every time a person is about to be placed in a Buffalo Police Department patrol car pursuant to this departmental policy; defendant's argument on this basis is rejected.

But the issue remains about the propriety of placing the defendant in the patrol car to expose him to this administrative search. The Government argues that Officer Harrington's

12

actions–removing defendant from his car to place him in the patrol car, for safety purposes, and patting down defendant before placing him in the patrol car--were reasonable (Docket No. 26, Gov't Response at 5, 6).  Under McCargo, the police are not required to use the least intrusive means, see 464 F.3d at 198 (id. at 6).  The Government points out that Officer Harrington, faced a possible attempted homicide suspect (or some one with a name very close to the suspect's name) in a vehicle, chose to remove that person and place him in the patrol car, committed the "most reasonable, intelligent, and safest course of action," and the frisk prior to placing him in the patrol car was also reasonable (id. at 6-7).

As noted in McCargo, 464 F.3d at 198, "the scope of a Terry stop must therefore be reasonable, but the methods police used need not be the least intrusive available.  'The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.'" (Quoting United States v. Sharpe, 470 U.S. 675, 686-87 (1985), citing United States v. Martinez-Fuerte, 428 U.S. 543, 557 n.12 (1976) for its rejection of the least restrictive means analysis); but cf. Sharpe, supra, 470 U.S. at 704 (Brennan, J., dissenting) (noting Florida v. Royer, 460 U.S. 491, 500 (1983) (opinion of White, J.) that the government must show at a minimum the least intrusive means reasonably available were used in carrying out the stop).

B. Placement of Suspect Passenger in Patrol Car

Courts have split on whether a suspect was under arrest when removed from their vehicle and placed in a police vehicle in the manner faced by defendant here.  For example, the Supreme Judicial Court of Maine, State v. Griffin, 459 A.2d 1086, 1089-90 (Me. 1983), held that removing a suspect from his vehicle and placing him into a police car was not an arrest.  The

Griffin court noted that this practice was a proper detective strategy to have the officer better judge the demeanor of the suspect and appraise his answers while affording the officer protection as opposed to leaving the suspect in his own vehicle where any readily available weapon may be present, id. at 1089-90, citing United States v. Harflinger, 436 F.2d 928, 933 (8th Cir. 1970) (upholding police decision to remove person from vehicle during stop).  The focus of Harflinger was removal of the person from the stopped vehicle rather than placing him into the police car; the Maine Supreme Court cited that case as a basis to conclude that requiring the person then to go into the police patrol car is also reasonable.

   This Court, however, has held that placing a suspect in a police vehicle in a similar circumstances constitutes an arrest requiring probable cause, United States v. Delgado, 797 F. Supp. 213, 218-19 (W.D.N.Y. 1991) (Skretny, J.) (discussed below); see also People v. Bloyd, 416 Mich. 538, 552, 331 N.W.2d 447, 454 (1982) (noting stigma associated with detention in a police car).  Thus, transportation of a suspect (and placing him in the police vehicle to do so) "should be dependent upon knowledge that a crime has been committed" and is impermissible where no crime has been committed and the police act upon mere suspicion, id. at 550, 331 N.W.2d at 453; 4 Wayne R. LaFave, Search and Seizure, § 9.2(g), at 80 (3d ed. 1996). In Florida v. Royer, the plurality of the Court found that, when a suspect in an airport was taken from the airport lobby into what the plurality termed the "police room" or the "police interrogation room," he was illegally seized then because such a seizure lacked probable cause, 460 U.S. 491, 502-03 (1983), see also id. at 509 (Brennan, J., concurring in the result) (officers subsequent action from the initial stop exceeded permissible bounds of Terry stop).  After noting that a Terry investigative stop "must be temporary and last no longer than is necessary to

14

effectuate the purposes of the stop" and the method employed "should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," id. at 500; see id. at 510 (Brennan, J., concurring in the result), the plurality found that there was cause to suspect that defendant, from his using an assumed name and traveling on a one-way ticket, to justify his temporary detention, id. at 502, but there was no indication that safety or security warranted moving him and detaining him in another room, id. at 505, rather the reason for the move was to enable authorities to search that defendant's luggage, id. Under Royer, the Government would need to establish that moving the suspect was the most expeditious and least intrusive alternative, see 4 LaFave, Search and Seizure, supra, § 9.2(g), at 81; see also Royer, supra, 460 U.S. at 505 (noting that state did not touch the question whether more expeditious ways existed to search defendant's luggage).

On the other hand, courts have upheld under Terry and its progeny police orders that require a suspect to move as part of a lawful Terry stop, United States v. Gori, 230 F.3d 44, 56, 47 (2d Cir. 2000) (citing cases, upholding police order to have apartment occupants move into hallway at entrance of police), cert. denied, 534 U.S. 824 (2001); see also Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) (per curiam) (upholding police practice of requiring all stopped drivers to exit vehicle during traffic stop).

Relocating a suspect during an investigative stop without probable cause is only justified by reasons of safety and security, Royer, supra, 460 U.S. at 505; see also Griffin, 459 A.2d at 1090. "In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor

15

may the police seek to verify their suspicions by means that approach the conditions of arrest," Royer, supra, 460 U.S. at 499.

Finally, courts have noted that there is no bright line distinction between the end of a Terry investigative stop and the beginning of an arrest, whether the officers' conduct renders the Terry stop so coercive as to become an arrest, see Sharpe, supra, 470 U.S. at 685.

In Delgado, Judge Skretny found a Border Patrol officer observed the defendant (suspected of being an illegal alien) arrive at the downtown train station in Buffalo. After asking defendant for identification and proof of citizenship and having defendant produce that identification and later open his luggage for inspection, the officer saw brown paper in one of defendant's pockets. He proceeded to pat down the defendant and placed him into the back of the officer's patrol car, telling defendant that he was not free to leave, although he was not formally under arrest. 797 F. Supp. at 214-15, 216. The Border Patrol officer called for back up from the Drug Enforcement Administration, who determined that defendant possessed a controlled substance, id. at 216. What had been a consensual encounter and search of his bag, id. at 217-18, became an unlawful arrest, id. at 218-19. Judge Skretny held that this detention in the police car was an unlawful arrest, concluding that placing defendant in the back of the patrol car was not the brief and narrowly circumscribed intrusion allowed in a investigative seizure or a Terry stop. United States v. Delgado, supra, 797 F. Supp. at 218-19 (W.D.N.Y. 1991) (quoting Dunaway v. New York, 442 U.S. 200, 212 (1979)). The agent's decision to place defendant in the patrol car was found to not be "'the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time,'" Delgado, supra, 797 F. Supp. at 219 (quoting Royer, supra, 460 U.S. at 500). Judge Skretny concluded that "defendant's detention in the

16

patrol car '. . . was a more serious intrusion on his personal liberty than is allowable on the mere suspicion of criminal activity,'" Delgado, supra, 797 F. Supp. at 219 (quoting Royer, supra, 460 U.S. at 502).

    C.    Application in This Case

Here, the reasons stated for placing defendant in the patrol car is the combination of defendant not having identification (hence requiring confirmation of his stated name) and the fact that the police were searching for a felony suspect with the same last name and first initial as the defendant said was his name. The only possible safety or security justification for placing defendant inside the police car is the fact that defendant's rather uncommon last name is the same as a wanted homicide suspect's and the shared first initial. After asking the defendant to leave the vehicle, Officer Harrington determined to place defendant in the patrol car while his identity was confirmed instead of leaving him outside of the vehicle, with the only stated reason being that the officers needed to confirm defendant's identity. There was no testimony that defendant posed a danger that would require him to be secured in the patrol car while his identity was being confirmed. Officer Harrington testified that safety required removing defendant from the car he was riding in (Docket No. 18, Tr. at 14). While defense counsel pointed out other means the officers could have used short of removing defendant and placing him in the patrol car (see id. at 40-42), Officer Harrington chose to remove defendant (as Officer Panaro chose to remove the driver Hall), based upon the "imminent danger" that defendant was in fact the wanted attempted homicide suspect Dorian Nailor and Harrington did not know what he was going to do to the officers (id. at 45). Under McCargo, the police need not use the least intrusive means, 464 F.3d at 198. Having the suspect in the patrol car while asking him questions to confirm his

17

identity (by contacting police headquarters by means of computer or radio inside the patrol car) is reasonable and convenient means while the officer confirms whether the person before him is the homicide suspect or not.

In general, relocating a suspect during a <u>Terry</u> stop is permissible and, here (based upon the totality of circumstances facing these officers) removing defendant from his vehicle and then placing him in the police patrol car were reasonable actions. The administrative search preceding entry into the patrol car, upheld in <u>McCargo</u>, is also reasonable here, given the officer's suspicions about the person he was confronting. It must be noted, however, that the combination of an extensive <u>Terry</u> stop, complete with relocation of the person into the police vehicle, and the Buffalo Police Department's policy for administrative searches prior to placing that person in that vehicle does pose potential risk for abuse. The police thus may be tempted to contrive any reason to "require" the stopped person to go into the police patrol car and thus subject them to the perquisite pat down search without any additional reasonable suspicion. For example, there may have been a reasonable basis for securing defendant in that manner (by having a name similar to a wanted attempted homicide suspect) but not for so securing the driver Hall, who was also to be placed in the vehicle merely to confirm whether he had a driver's license.

Thus, the totality of the circumstances in this <u>Terry</u> stop is reasonable. Defendant's motion to suppress (Docket No. 12) the seized firearm and defendant's subsequent statements should be **denied** and the firearm and statements should **not be suppressed**.

**CONCLUSION**

Based upon the above, it is recommended that defendant's motion to suppress (Docket No. 12) the seized handgun and defendant's statements be **denied**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72.3(a).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

SO ORDERED.

*/s/ Hugh B. Scott*
Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
April 9, 2007